# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

MARK EDWARDS, as Personal Representative of
the Estates of Ronald Bramlage, deceased;
Rebecca Bramlage, deceased; Brandon Bramlage,
deceased, Boston Bramlage, deceased, Beau Bramlage,
deceased, and Roxanne Bramlage, deceased,

     *Plaintiff,*

-vs-.

PILATUS AIRCRAFT, LTD., a/k/a Pilatus
Flugzeugweke Aktiengesellschaft, a Swiss
company doing business in the United States,

PILATUS BUSINESS AIRCRAFT, LTD., a
Colorado corporation,

HONEYWELL INTERNATIONAL INC., individually,
and as successor to AlliedSignal Aerospace, Inc.,
and Bendix/King, a Delaware corporation,

PRATT & WHITNEY CANADA, a Canadian corporation,

ROSEMOUNT AEROSPACE, INC., d/b/a Goodrich
Sensor Systems, a Delaware Corporation,

LEACH INTERNATIONAL, a Delaware corporation,

DRI RELAYS, INC., a Delaware corporation,

GLENAIR, Inc., a California corporation,

EPPS AIR SERVICE, INC., d/b/a Epps Aviation, Inc., and

MARTIN AVIATION, INC., a California corporation,

     *Defendants.*

Case No:

8:14-CV-1326-T-33MAP

---

## COMPLAINT
## & JURY DEMAND



FILED

TPA23827

Plaintiff, Mark Edwards, as Personal Representative of the Estates of Ronald Bramlage, deceased;  Rebecca Bramlage, deceased; Brandon Bramlage, deceased, Boston Bramlage, deceased, Beau Bramlage, deceased, and Roxanne Bramlage, deceased, sues Defendants, Pilatus Aircraft, Ltd., a/k/a Pilatus Flugzeugweke Aktiengesellschaft, ("Pilatus"),    Pilatus Business Aircraft, Ltd., (PiBal), Honeywell International Inc., individually, and as successor-in-interest to AlliedSignal Aerospace, Inc., and Bendix/King, ("Honeywell"), Pratt & Whitney Canada ("PWC"), Rosemount Aerospace,Inc., d/b/a Goodrich Sensor Systems ("Goodrich"), Leach International ("Leach"), DRI Relays, Inc. ("DRI"), Glenair, Inc. ("Glenair"), Epps Air Service, Inc., d/b/a Epps Aviation, Inc., ("EPPS") and Martin Aviation, Inc. ("Martin"), and alleges as Follows:

## Jurisdictional Allegations

1.      This claim arises out of a fatal crash of a Pilatus model PC-12/47 aircraft in Polk County, Florida on June 7, 2012.

2.      This court has subject matter jurisdiction, pursuant to 28 U.S.C.A. §1332, because the amount in controversy is in excess of the court's seventy five thousand dollar ($75,000.00) jurisdictional limit, excluding interests and costs and the Plaintiff is diverse from all Defendants.

3.      The action is brought pursuant to the Florida Wrongful Death Act, §768.16 *et seq,* for the wrongful deaths of Ronald Bramlage and Rebecca Bramlage and their

four (4) minor children: Brandon Bramlage, Boston Bramlage, Beau Bramlage and Roxanne Bramlage, (hereinafter "Bramlage family").

4.        Pursuant to the Florida Wrongful Death Act, §768.16 *et seq.*,[1] the survivors of decedent Ronald Bramlage are his biological parents, Bob Bramlage and Patty Wertsberger. The survivors of decedent Rebecca Bramlage are her biological parents, Gary and Helen Johnson.

5.        Plaintiff, Mark Edwards, is the duly appointed Executor of the Estates of the decedents, by order of the District Court of Geary County, Kansas, and has the sole authority to bring these claims on behalf of the Estate and survivors of the Bramlage family. Plaintiff Mark Edwards and all decedents are/were residents of the State of Kansas.

6.        Defendant Pilatus Aircraft, Ltd., a/k/a Pilatus Flugzeugweke Aktiengesellschaft, (hereinafter "Pilatus"), is a foreign entity headquartered in Stans, Switzerland and is engaged in the designing, co-manufacturing, marketing, sales and servicing of the PC-12/47. Pilatus conducts more than $200 million in annual business with its wholly owned U.S. subsidiary, Pilatus Business Aircraft, Ltd. Pilatus maintains significant contacts in the United States and Florida. It applied to the Federal Aviation

---

[1] Additionally, should Kansas Law be deemed applicable, pursuant to K.S.A. §60-1901 *et seq.* Kansas resident Bob Bramlage and Arizona resident Patty Wertsberger is heirs-at-law for Ronald Bramlage, Kansas residents Gary Johnson and Helen Johnson are heirs-at-law for their daughter, Rebecca Bramlage. All four heirs-at-law for their four minor grandchildren, decedents Brandon, Boston, Beau and Roxanne Bramlage.

Administration ("FAA") for a United States Type Certificate[2] allowing its PC-12 aircraft to be legally operated in the United States.  It also markets its aircraft in Florida, recently advertising and sponsoring a Fixed Wing Operations Course at the 2013 Airborne Law Enforcement Officers Association convention in Orlando, Florida. Also, since 2010, the United States Air Force Special Operations Command at Hurlburt Field, Florida has operated two squadrons of PC-12 under the military designation U-28A purchased directly from Pilatus. These systematic and significant contacts within the state of Florida give rise to Personal Jurisdiction over Pilatus in the United States and Florida. The State of Florida and this Court have personal jurisdiction over Pilatus, pursuant to Florida's Long-Arm Statute, Section 48.193(1)(f)(1) and (2), Florida Statutes, because Pilatus manufactured products outside of Florida that caused injury to persons or property within this state and engages in substantial, and not isolated, business activity in the State of Florida on a continuous and systematic basis.

7.    Defendant Pilatus Business Aircraft Ltd., ("PiBal") is a corporation organized under the laws of the state of Colorado and is a wholly owned subsidiary of Pilatus doing business from its principal place of business in Broomfield, Colorado. PiBal was formed to provide completions, marketing, sales and service for Pilatus in the

---

[2] Issued by the FAA to signify the design is airworthy and, if for an aircraft, it can be issued an airworthiness certificate denoting strict conformance with the Type Certificate. Once issued, the design cannot be changed. A supplemental type certificate (STC) defining a proposed modification can be issued if it meets safety criteria and defines how the existing design is effected.  Pilatus, as the manufacturer of the Pilatus PC-12, holds FAA Type Certificate A78EU under which it certified to the FAA that its design met specified criteria in 14 C.F.R. §§ 21.11-.53.

United States and partially co-manufactures sixty percent of all Pilatus PC-12 model aircraft.   PiBal markets its PC-12 aircraft in Florida, recently advertising and co-sponsoring a Fixed Wing Operations Course at the 2013 Airborne Law Enforcement Officers Association convention in Orlando, Florida.   Also, since 2010, PiBal has supported the United States Air Force Special Operations Command's squadrons of PC-12 aircraft at Hurlburt Field, Florida. These systematic and significant contacts within the state of Florida give rise to Personal Jurisdiction over PiBal in Florida. The State of Florida and this Court have personal jurisdiction over PiBal, pursuant to Florida's Long-Arm Statute, Section 48.193(1)(f)(1) and (2), Florida Statutes, because PiBal manufactured products outside of Florida that caused injury to persons or property within this state and engages in substantial, and not isolated, business activity in the State of Florida on a continuous and systematic basis.   PiBal is subject to service at its Colorado corporate address.

     8.   Defendant Honeywell International Inc., ("Honeywell") is a corporation organized under the laws of the State of Delaware that produces a variety of aviation products, services and systems for the private, public and military sectors from its principle place of business located at 101 Columbia Road, Morristown, New Jersey. Honeywell is the successor-in-interest to avionics manufacturers Bendix/King and AlliedSignal. Honeywell maintains offices in Florida, including Deerfield Beach, Ft. Lauderdale, Clearwater, Cocoa Beach, Altamonte Springs, Boynton Beach and Aventura, and is subject to service in Florida through its Registered Agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Fl. 32301. The State of Florida and

this Court have personal jurisdiction over Honeywell, pursuant to Florida's Long-Arm Statute, Section 48.193(1)(f)(1) and (2), Florida Statutes, because it manufactured products outside of Florida that caused injury to persons or property within this state and engages in substantial, and not isolated, business activity in the State of Florida on a continuous and systematic basis.

9.      Defendant Pratt & Whitney Canada, ("PWC") is a Canadian aircraft engine manufacturer which designs, markets and manufactures aircraft engines, including the PT6A-67B engine installed in the Pilatus PC-12. PWC is a division of Pratt & Whitney which is, itself, a division of United Technologies. PWC's principal place of business is in Longueuil, Quebec, just outside Montreal. The State of Florida and this Court have personal jurisdiction over PWC, pursuant to Florida's Long-Arm Statute, Section 48.193(1)(f)(1) and (2), Florida Statutes, because PWC manufactured products outside of Florida that caused injury to persons or property within this state and engages in substantial, and not isolated, business activity in the State of Florida on a continuous and systematic basis.

10.      Defendant Rosemount Aerospace, Inc., d/b/a Goodrich Sensor Systems ("Goodrich") is a corporation organized under the laws of the State of Delaware that designs and manufactures components for business aircraft from its principal place of business in Minnesota. Goodrich manufactured the subject aircraft's Angle of Attack transmitters, components of the de-icing system and other components. Goodrich is subject to service through its Registered Agent, CT Corporation System. The State of Florida and this Court have personal jurisdiction over Goodrich pursuant to Florida's

Long-Arm Statute, Section 48.193(1)(f)(1) and (2), Florida Statutes, because it manufactured products outside of Florida that caused injury to persons or property within this state and engages in substantial, and not isolated, business activity in the State of Florida on a continuous and systematic basis.

11.    Defendant Leach International Corporation ("Leach") is a corporation organized under the laws of the State of Delaware. Leach is a designer and manufacturer of aerospace switching components used in the aerospace industry and operates from its principal place of business in Buena Park, California. Leach is subject to service through its Registered Agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801. The State of Florida and this Court have personal jurisdiction over Leach pursuant to Florida's Long-Arm Statute, Section 48.193(1)(f)(1) and (2), Florida Statutes, because Leach manufactured products outside of Florida that caused injury to persons or property within this state and engages in substantial, and not isolated, business activity in the State of Florida on a continuous and systematic basis.

12.    Defendant DRI Relays, Inc. ("DRI"), is a corporation organized under the laws of the State of Delaware. DRI is a designer and manufacturer of aerospace relay switching components used in the aerospace industry under the trade names of "R.E. Deutsch", and "Deutsch Relay Inc". DRI operates from its principal place of business at 65 Daly Road, East Northport, New York, 11731 and is subject to service through its Registered Agent, The Prentice-Hall Corporation System, Inc., 80 State Street, Albany, New York, 12207.  The State of Florida and this Court have personal jurisdiction over

DRI pursuant to Florida's Long-Arm Statute, Section 48.193(1)(f)(1) and (2), Florida Statutes, because DRI manufactured products outside of Florida that caused injury to persons or property within this state and engages in substantial, and not isolated, business activity in the State of Florida on a continuous and systematic basis.

13.     Glenair Inc. ("Glenair") is a corporation organized under the laws of the State of California that manufactures plugs and operates from its principal place of business at 1211 Air Way  Glendale, CA 91201-2497.   The State of Florida and this Court have personal jurisdiction over Glenair, pursuant to Florida's Long-Arm Statute, Section 48.193(1)(f)(1) and (2), Florida Statutes, because it was a seller of new products in the stream of commerce manufactured products outside of Florida that caused injury to persons or property within this state.  Glenair can be served through its Registered Agent, Patrick L McGee at the corporate address.

14.     Defendant Martin Aviation, Inc., ("Martin") is a corporation organized under the laws of the State of California that operates as an authorized Pilatus and Honeywell service center from its principal place of business at 19300 Ike Jones Road, Santa Ana, CA 92707.  Martin, in 2011, sold new parts incorporated in the subject aircraft. The State of Florida and this Court have personal jurisdiction over Martin, pursuant to Florida's Long-Arm Statute, Section 48.193(1)(f)(1) and (2), Florida Statutes, because it was a seller of new products in the stream of commerce manufactured products outside of Florida that caused injury to persons or property within this state. Martin is subject to service of process through its designated Registered Agent, Mark Foster at the principal place of business.

15.     Defendant Epps Air Service, Inc., d/b/a Epps Aviation, Inc., ("EPPS") is a corporation organized under the laws of the State of Georgia that operates as an FBO and authorized Pilatus and Honeywell service center from its principal place of business at 1 Aviation Way, DeKalb-Peachtree Airport, Atlanta, GA 30341. Since 1996, Epps has sold and serviced Pilatus Aircraft and is the Pilatus sales representative for Florida, and other states. It is also an authorized service center for avionics manufacturers Honeywell, Bendix/King, L3, and Garmin, who's products are incorporated in the subject aircraft. In 2012, EPPS sold new parts incorporated in the subject aircraft. The State of Florida and this Court have personal jurisdiction over EPPS, pursuant to Florida's Long-Arm Statute, Section 48.193(1)(f)(1) and (2), Florida Statutes, because it was a seller of new products in the stream of commerce manufactured products outside of Florida that caused injury to persons or property within this state.   EPPS is subject to service of process through its designated Registered Agent, E. Patrick Epps, at its principal office.

16.     Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of the events, acts or omissions occurred in the Middle District of Florida.

17.     Because the subject aircraft and its components were all first sold in 2006 or later, this claim is not barred by The General Aviation Revitalization Act of 1994, § 2(a), 49 U.S.C.S. § 40101.

## General Allegations



**PC-12/47**

18.     The mishap aircraft was a 2006 model year Pilatus PC-12/47, serial number 730, bearing FAA registration N950KA and was titled in the name of Mr. Bramlage's business, Roadside Ventures, LLC.

19.     The Pilatus PC-12/47 is a fixed-wing, turboprop, passenger and cargo aircraft operated in the Normal Category. It was designed by Pilatus and manufactured, in part, by Pilatus and, in part, by PiBal. The PC-12/47 received its FAA Type Certificate A78EU in 2005.

### Powerplant

20.     The PC-12/47 is powered by a single PT6A-67B turboprop engine manufactured by Defendant PWC. The engine installed in the subject aircraft was

manufactured as serial number PCE-PR0604. As used herein, "engine" includes any incorporated components, including its gas generator module, power section, rotors, rotor compressors, bearings, couplings, gears, shafts, wiring harnesses, rollers, fuel pumps, fuel controllers, jets, compressors, rings, shafts, tubes, cables, engine mounts and other accessories.

## Electronic Flight Management System

21.     N950KA's electronic flight management system, (hereinafter "FMS"), incorporates a number of flight control components, including its two major components: the Electronic Flight Instrumentation System (EFIS); and Digital Flight Control System (autopilot). As defined here, the FMS also includes any and all related hardware, mounting hardware, servos, actuators, wires, Canon Plugs, cables, brackets, buttons, switches and relays necessary to control the various Avionics, any electrically managed control surfaces and the following FMS components:

a.     Honeywell EFS 50 ("EFIS"): A panel mounted electronic flight and navigation display system that receives data from the Altitude and Heading Reference System (AHRS), stick shaker/pusher, autopilot and other systems.  It provides the pilot with a real-time visual depiction of heading (direction), horizontal situation, (aircraft's wing leveling, banking and turns) and flight attitude (aircraft's nose relative to the horizon).[3] The EFIS system also includes the symbol generators below;

---

[3] The HSI also guides the pilot during Instrument Approach Procedures. This phase of flight is not relevant to the accident.  The instrument was formerly manufactured by AlliedSignal, a predecessor of Honeywell Inc.

b.    Honeywell SG465 Forward and Aft Symbol Generators are part of the EFIS and receives signals from the aircraft's various systems and monitors the system for faults to create graphic symbols on the Electronic Altitude Directional Indicators and Horizontal Situation Indicators. In 2011, after numerous complaints of unintentional autopilot disconnects in smooth air, Honeywell issued Service Bulletins warning of the condition;

c.    Honeywell KFC 325 "Autopilot" provides a three-axis digital flight control system that combines autopilot and flight director computation functions. It controls the aircraft's pitch, yaw and trim through an electric system incorporating servos connected to the aircraft's ailerons[4] and elevators.[5]  It includes an auto trim system for pitch and rudder (directional) trim during yaw damper and autopilot operation. It also tracks selected headings or to GPS navigational aids, instrument approach procedures and can maintain, or "hold", altitude, Indicated Airspeed and Yaw Damp which, in enroute mode,[6] automatically maintains altitude and flies a complete route using only inputs from the aircraft's GPS and EFIS;

d.    Honeywell KMC 321 Mode Controller allows the pilot to select various navigational, altitude, attitude and directional control features of the autopilot;

---

[4] Ailerons are hinged flight control surfaces located on both of the aircraft's outer wing's trailing edges that control roll, resulting in a change in heading.

[5] Elevators, like ailerons, are horizontally mounted hinged flight control surfaces located on the tail of the aircraft that control the (nose up or nose down) attitude to either climb, descend or maintain level altitudes.

[6] Formerly manufactured by Honeywell predecessor, Bendix King. The equipment is also capable of maintaining directional and altitude guidance during Instrument Approach Procedures. This phase of flight is not relevant to the accident.

e.      Honeywell KCP 220 Flight Computer;

f.      Honeywell KTA 336 Trim Adapters;

g.      Honeywell KSA 372 Aileron Servo Actuators;

h.      Honeywell KSA 372 Pitch Servo Actuator;

i.      Honeywell KSA 372 Yaw Servo Actuator;

j.      KSM 375 Yaw Servo Mounts;

k.      KSM 375 Roll Servo Mount;

l.      KSM 375 Pitch Servo Mount;

m.      Electromech Technologies Aileron Trim Actuator;

n.      Leach electronic relays controlling rudder trim;

o.      DRI electronic relays controlling aileron trim and trim;

p.      Glenair plugs and interconnectors.

### Anti-Stall System

22.     The PC-12 has a unique and hazardous aerodynamic and stall characteristic[7] that does not meet current FAA certification criteria.[8]

23.     In Pilatus' application for its FAA type certificate, it proposed that PC-12 aircraft be equipped with an anti-stall stick-shaker/stick-pusher system[9] that prevents the aircraft from entering a stall condition.

---

[7] A "stall" occurs when the wings are providing insufficient lift. If not immediately corrected through increased speed and/or decreased angle-of-attack, the aircraft will enter into a spin.

[8] Under FAA Certification Standards, 14 C.F.R. 23.221, a single-engine, normal category airplane must be able to recover from a one-turn spin or a three-second spin, whichever takes longer, in not more than one additional turn after initiation of the first control action for recovery and an unrecoverable spin cannot be possible.

24.    The system includes dual angle-of-attack vanes (sensors) mounted on probes near each wingtip that are expected to sense when the wing is approaching a stall and two stick pusher computers. The information is transmitted, using angle-of-attack transmitters manufactured by Goodrich, to command a stick pusher to forcefully shake or move the control wheel forward.  A failure of the system is expected to result in a warning on the aircraft's Central Audible Warning System (CAWS).

25.    If the propeller de-ice is switched "on" and the inertial separator is set to "open" the "pusher ice" mode is active and the pilot is alerted by the CAWS, which lowers the shaker and pusher actuation points 8° below normal angle-of-attack.  If only one of the pusher computers is set in pusher ice mode, an alert is sounded.

26.    Pilatus represented to the FAA that stall risk was prevented when the PC-12 is equipped with the system and its FAA Type Certificate requires the system. Despite this, there have been a number of fatal PC-12 accidents involving spins that were either caused or not prevented by the stall prevention systems.

27.    The system has been the subject of two safety-related Airworthiness Directives issued by the FAA. In 2008, the FAA issued Airworthiness Directive AD 2008-06-17 warning of an unsafe condition pertaining to the anti-stall shaker/pusher system of certain PC-12 models because its rear cable clamp shifts forward on the elevator cable which reduces the effectiveness of the system and/or elevator's movement. The FAA issued AD 2009-05-07, effective March 30, 2009, which superseded AD 2008-06-

---

[9]  A stick shaker alerts the pilot to a potential for an impending stall by transmitting heavy vibrations to the stick so that the pilot can appreciate the condition and take corrective action. The pusher forces the control yoke (stick) forward to lower the nose and increase the aircraft's speed to prevent an imminent stall.

---

17 and Pilatus published Service Bulletin 27-020 rev.1., which required inspection of the stick-pusher servo-cables installation and adjustment of the stick pusher cable tension according to a new Aircraft Maintenance Manual procedure, which introduces a higher cable tension and accounts for cable relaxation during the assembly. These notices were complied with prior to the compliance deadline.

### Maintenance

28.     Within the year immediately preceding the crash, Martin performed substantial and relevant maintenance on the aircraft, including the replacement of parts, and inspections of critical components.  This includes the:

a.      replacement of components of the pitch trim system, cargo door, Engine Instrument System;

b.      servicing and/or replacement of emergency power supply, annunciators, Altitude and Heading Reference System (AHRS),

c.      testing of the stick shaker/stick pusher system and aspects of the aircraft's cabin pressurization system,

d.      performance of the 5-year inspections required by the Pilatus Maintenance Manual; 2000 hour inspections of the flight control cables; 100 hour inspections of the airframe and engine; and,

e.      Compliance with service bulletins pertaining to the battery, engine, and oxygen masks.

29.     Within the year immediately preceding the crash, EPPS performed substantial and relevant maintenance on the aircraft, including the replacement of parts, and inspections of critical components.  This includes the:

a.      Pre-purchase inspection of the aircraft;

b.      replacement of components of the hydraulic pump and EIS Display unit;

c.      adjustment of Generator #2's belt tension;

d.      compliance with Airworthiness Directives and Service Bulletins pertaining to the Oxygen and other systems; and,

e.      performed 2012 annual inspection, 3000 hour / 1 year inspection of the horizontal stabilizer trim runaway aural warning system and 1000 hour / 1 year servo mount clutches.

30.     The defects identified in Paragraph forty-four (44) below were present in N950KA at the time maintenance and inspections were conducted by EPPS and Martin.

## The Flight

31.     The June 7, 2012 trip was a private, non-commercial, flight made pursuant to 14 C.F.R. Part 91 from St. Lucie County International Airport (FPR) in Fort Pierce, Florida to Freeman Field Airport in Junction City, Kansas. The Bramlage family was returning from a trip to the Bahamas and had stopped in Fort Pierce to clear U.S. Customs.

32.     The flight from Fort Pierce was conducted under Instrument Flight Rules (IFR) which allowed the pilot to fly solely with reference to cockpit instruments when

visual contact with the ground and/or horizon is not possible or is limited, such as while in clouds.

33.    The pilot-in-command of N950KA was Decedent Ronald Bramlage, a properly certificated, rated and current instrument pilot, who had received extensive professional training by Simcom in the accident aircraft.

34.    At about 12:06 p.m.,[10] the flight departed from Ft. Pierce and, shortly thereafter, air traffic control ("ATC") responsibility was transferred to the FAA's Miami Center air traffic facility.

35.    At 12:29 p.m., the flight was cleared to 25,000 feet MSL.[11]

36.    At about 12:30 p.m., ATC cleared the flight to 26,000 feet, which was acknowledged by the pilot.

37.    At about 12:32 p.m., ATC advised N950KA of a large area of precipitation northwest of Lakeland, with moderate, heavy and extreme echoes. ATC asked the pilot to look at it and to advise what direction he needed to deviate, then suggested deviation right of course until North of the adverse weather. The pilot responded that he agreed. ATC asked what heading would keep the airplane clear, and the pilot responded 320°. ATC then cleared the pilot to fly a heading of 320°, to deviate right-of-course when necessary and, when able, proceed direct to Seminole,[12] which the pilot acknowledged. This was the final communication between the pilot and ATC.

---

[10]  17:06:56 UTC. NTSB Electronic Specialists Factual Report, §2.2.2.
[11]  MSL denotes Mean Sea Level.  Due to Florida's low elevation, MSL altitude is typically about the same as altitude above ground level (AGL).
[12]  "Seminole" is a radio navigational aid located near Tallahassee, Florida to which pilots can navigate using on board equipment.

38.     Between 12:32:37 p.m., and 12:33:25 p.m., the flight proceeded in a west-northwesterly direction, and climbed from 24,700 feet to about 25,100 feet.

### The Crash

39.     Starting at about 12:33:33 p.m., while at an altitude of about 25,181 feet MSL, a major upset sequence commenced.

40.     The aircraft's central audible warning system (CAWS), generated audible and visual warnings indicating a number of malfunctions and conditions, including warnings that the autopilot had disengaged, the trim control failed and the passenger door and oxygen systems "activated."

41.     During this sequence, N950KA suddenly pitched down approximately 60° degrees, causing the airspeed to rapidly increase from 109 knots to 338 knots as the aircraft descended 10,000 feet in 40 seconds, a rate of approximately 35,000 feet-per-minute. The aircraft banked as much as approximately 90°.  It began to experience an in-flight breakup causing the in-flight ejection of rear seat passenger, 13-year-old Boston Bramlage, at altitude. The aircraft entered into a flat spin with black smoke trailing.

42.     N950KA's 25,000 foot descent took just over 2 full minutes.

43.     At about 12:35:39 p.m., the aircraft crashed near Lake Wales, Florida. The entire Bramlage family was fatally injured in the crash. The remains of 13-year-old Boston Bramlage were later found one-half mile from the main wreckage.

## N950KA's Defects

44.     N950KA crashed due to a combination of the following defects:

a.      the left cabin passenger door, its six shoot bolts, striking plates and door seal failed to remain securely sealed in flight resulting in the catastrophic and explosive loss of cabin pressurization and structural integrity;

b.      the aircraft's aileron and/or rudder trim failed, eliminating yaw control, aircraft attitude stability and the pilot's ability to control the aircraft;

c.      a run-a-way trim condition ensued that resulted in an uncommanded 50° - 90° right bank and/or 60° nose down attitude and the aircraft's and trim system's instructions and procedures failed to provide pilots with adequate warnings about those defects;

d.      the electric trim's emergency disconnects, switches, connectors and relays simultaneously failed, which prevented the pilot from electronically disconnecting the affected trim servos and actuators and precluded the pilot's ability to manually arrest the aircraft's descent despite his best efforts. Additional components of the FMS system failed to maintain or restore the aircraft's yaw, direction, altitude, lateral axis, vertical axis, longitudinal axis, roll axis, pitch axis, its turn (bank) and descent rate and the aircraft's instructions and procedures failed to provide pilots with adequate warnings about those defects;

e.      The autopilot and FMS had hazardous characteristics that rendered it inoperable and/or incapable of preventing a stall and/or spin in certain circumstances and failed in flight. Additionally, its instructions and procedures

failed to provide pilots with adequate warnings about those characteristics and defects;

f.      components of the aircraft's right wing structure, flaps, ailerons and their attachment bolts failed. The left aileron, outboard section of the left wing and wing tip, parts of the second and third sections of the right wing, right aileron and portions of the right flap all separated in flight as did the horizontal stabilizer and its outboard tip mass balance weight. The outboard 3 feet of the right hand stabilizer and elevator also separated in flight.  A portion of right wing leading edge separated and struck the right-side fuselage, depressing the emergency exit window and ripping an approximate 36-inch by 8-inch hole in the fuselage above and below the right 2nd and 3rd passenger windows, resulting in a large breach of the right fuselage;

g.      the pilot was alerted through an audible CAWS warning that the aircraft's stick shaker/stick pusher entered "pusher ice" mode indicating that only one of the pusher computers was in pusher ice mode;

h.      the angle-of-attack transmitters and anti-stall stick shaker/stick pusher system failed to properly detect, warn transmit and correct the dangerous angle-of-attack, airspeed or their combination so as to avoid the inadvertent and unintentional entry into an unrecoverable stall and subsequent spin;

i.      the engine failed and/or failed to develop the rated power specified in the FAA's Type Certificate and Pilot Operating Handbook for the given conditions,

which prevented the timely introduction of the additional power requested and needed by the pilot to timely recover from the stall;

j.      the instructions, directions and warnings were defective in that they failed to warn the pilot of circumstances in which the stick shaker/stick pusher and autopilot systems were inoperable and/or incapable of preventing a stall or spin condition; and,

k.      other failures and defects to be determined.

45.    The defects described above were present at the time of the N950KA's manufacture. They were latent and unknown to Ronald Bramlage and were undiscoverable despite reasonable inspection. However, the defects were known to the relative manufacturers.

46.    The defects above relate to the maintenance, inspections, testing and component replacements performed by Defendants Martin and EPPS, as described in paragraphs twenty-five (25) and twenty-six (26) above, which were latent and unknown to Ronald Bramlage and were undiscoverable despite reasonable inspection, but known or discoverable to the mechanics.

47.    At the time of N950KA's manufacture, the injury-causing aspects of the aircraft, engine, FMS and stick shaker/stick pusher, were not in compliance with their FAA Type Certificate(s) nor did the aircraft's unique and hazardous aerodynamic and stall characteristics meet the (then) current FAA certification criteria and standards for stall safety.

# Damages

48.     Pursuant to the Florida Wrongful Death Act, §768.16 *et seq.*, as a direct, probable, foreseeable, and proximate result of the defendants' negligence and the defective nature of the aircraft and its components, as aforesaid and as stated below:

a.     the statutory survivors of Ronald Bramlage have suffered losses for which Defendants are responsible, including the loss of the decedent's companionship, instruction, affection and guidance, along with mental pain and suffering as a result of his death, which have accrued from the date of their deaths and will continue in the future;

b.     the statutory survivors of Rebecca Bramlage have suffered losses for which Defendants are responsible, including the loss of the decedent's companionship, instruction, affection and guidance, along with mental pain and suffering as a result of his death, which have accrued from the date of their deaths and will continue in the future;

c.     the Estates of Ronald Bramlage and Rebecca Bramlage have lost the value of their earnings with interest thereon from the date of injury to the date of death, the value of household services and the loss lost the net accumulations beyond death;

d.     the Estate and/or Survivors of Ronald Bramlage, Rebecca Bramlage, Brandon Bramlage, Boston Bramlage, Beau Bramlage and Roxanne Bramlage to the extent they have incurred funeral and burial expenses;

Alternatively, though not recoverable under Florida law, the following claims are alleged if, and only if, the law of another state is deemed applicable to this matter:

e.     the survivors of Brandon Bramlage, Boston Bramlage, Beau Bramlage and Roxanne Bramlage have suffered: mental anguish; suffering, or bereavement; loss of society; companionship, comfort, or protection; loss of attention, advice or counsel; loss of filial care or attention and the value of the decedents' companionship and protection which have accrued from the date of their deaths and will continue in the future;  and/or,

f.     prior to their deaths, the members of the Bramlage family all sustained severe fear, mental pain and terror in contemplation of their imminent deaths.

# COUNT I

## Negligence of Pilatus & PiBal

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) above, and alleges further:

49.     At all material times, Pilatus and PiBal were engaged in a joint venture and agreed to combine their resources and efforts to design, manufacture, assemble, market and sell the PC-12/47 in the United States.

50.     Under this joint venture, N950KA was designed by Pilatus and co-manufactured by both Pilatus and PiBal.

51.     As co-manufacturers, Pilatus and PiBal owed a duty of reasonable care to the pilots and foreseeable passengers flying in their aircraft to properly design,

manufacture and test their aircraft: to be airworthy; to ensure that it would not fail in foreseeable flight conditions and to have sufficient redundancy in its various systems as to allow it to function in the event of a foreseeable failure or anomaly and to warn foreseeable users of the limitations of the PC-12/47 and of potential defects.

52.     In co-manufacturing N950KA, Pilatus Aircraft and PiBal breached their aforementioned duties of reasonable care by failing to:

a.     design, manufacture, assemble, market and test the PC-12/47 and its incorporated components and systems in an professionally reasonable and airworthy manner, as advertised, designed, intended and FAA Type Certificated;

b.     incorporate processes, structures, systems and components that do not fail during normal use, foreseeable conditions, foreseeable misuse, failure or mechanical anomaly;

c.     predict and prevent failures in the PC-12/47 and its incorporated components, through proper testing and system redundancy;

d.     eliminate known characteristics that render the PC-12/47 uncontrollable or that allow inadvertent entry into unrecoverable stalls or spins;

e.     incorporate an FMS that does not cause a loss of control or prevent a pilot from an ability to interrupt or override it;

f.     incorporate a safe entry system that maintains cabin pressurization;

g.     incorporate a reliable engine, capable of providing the anticipated rated power required by its FAA Type Certificate;

h.     provide reasonably accurate instructions and directions;

    i.    reasonably warn, through timely notices, warnings, Service Bulletins and/or Airworthiness Directives, of any known limitations, anomalies, defects or potential failures in the aircraft or incorporated systems; or about circumstances in which unsafe conditions, failures or anomalies can occur; and,

    j.    otherwise design, manufacture, test, market, sell or support the PC-12/47.

53.    At all material times, Pilatus and PiBal had common interests and were acting on behalf of, and within the scope of, their joint venture.

54.    In their joint venture, Pilatus and PiBal enjoyed: joint control or the right of control; joint ownership interests in the venture; and a common right to share in their venture's profits and losses.

55.    At all material times, Pilatus and PiBal are responsible for each other's negligence committed while acting on behalf of, or within the scope of, the joint venture's business.

56.    As a direct and proximate result of the negligence of Pilatus and PiBal, as aforesaid, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Defendants Pilatus Aircraft and PiBal and a trial by Jury on all issues.

# COUNT II

## Strict Liability of Pilatus & PiBal

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) and fifty (50) above, and alleges further:

57.     Pilatus and PiBal entered N950KA into the stream of commerce as a new product.

58.     When it left their control N950KA was in a defective and unreasonably dangerous condition by nature of the defects stated in paragraph forty-four (44) above.

59.     N950KA was expected to reach, and did reach, Ronald Bramlage without substantial change in the condition in which it was first manufactured and sold and was in substantially the same condition at the time of the crash.

60.     Ronald Bramlage and his passengers were among those expected to use the aircraft.

61.     Pilatus and PiBal knew that N950KA would be used without any ability to inspect for the hidden defects stated in paragraph forty-four (44) above, which were neither visible nor known to Ronald Bramlage prior to the crash despite best efforts, substantial training and a diligent pre-flight inspection but which were known to Pilatus and PiBal, which failed to warn Mr. Bramlage.

62.     As a direct and proximate result of the defective nature of N950KA and its warnings, as aforesaid, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Defendants Pilatus Aircraft and PiBal and a trial by Jury on all issues.

# COUNT III

## Negligence of Honeywell

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) above, and alleges further:

63.   Honeywell designed, manufactured, assembled, marketed and sold the FMS and autopilot systems described above.

64.   Honeywell owed a duty of reasonable care to properly design, manufacture and test their products; to be airworthy; to ensure that they would not fail in foreseeable flight conditions; to have sufficient redundancy as to allow them to function in the event of a foreseeable failure or anomaly; to provide proper instructions on their use; and to warn of limitations and any foreseeable failures and/or defects.

65.   Honeywell breached its duty to use reasonable care by failing: to manufacture its FMS and Autopilot systems free of hazardous characteristics that rendered them inoperable and/or incapable of preventing a stall or spin condition under certain circumstances; to manufacture the FMS and autopilot system in an airworthy manner, as designed, intended and as FAA Certificated; to incorporate safe and proven components so as to prevent their causing a loss of aircraft control or run-a-way situation that cannot be overcome or interrupted by the pilot; to predict and prevent failures through proper testing and redundancy; and, to reasonably warn, through timely

and sufficient warnings, instructions, procedures, notices, service bulletins and/or Airworthiness Directives, of any known limitations, defects or potential failures in their products.

66.    As a direct and proximate result of the negligence of Honeywell, as aforesaid, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Honeywell International Inc., and demands a trial by jury on all issues triable.

## COUNT IV

### Strict Liability of Honeywell

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) and sixty-three (63) above, and alleges further:

67.    Honeywell entered its FMS and autopilot systems as new products into the stream of commerce for incorporation into N950KA.

68.    When these systems left the control and custody of Honeywell, they were in a defective and unreasonably dangerous condition by nature of the defects stated in forty-four (44)(b)-(e) above and were in substantially the same condition at the time of the crash as at the time of first delivery.

69.    Honeywell knew its products would be used without the ability to inspect for the hidden defects above, which were not visible or known to Ronald Bramlage prior

to the crash despite a diligent pre-flight inspection, but known to Honeywell, which failed to warn Mr. Bramlage.

70.   As a direct and proximate result of the defective nature of the FMS, the autopilot and its warnings, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Honeywell International, Inc., and demands a trial by Jury on all issues.

---

## COUNT V

### Negligence of Pratt & Whitney Canada

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) above, and alleges further:

71.   PWC designed, manufactured, assembled, marketed and sold its engine, as described above, as a new product for incorporation into N950KA.

72.   As the manufacturer, PWC owed a reasonable duty of care to the pilots using its engine and their foreseeable passengers to properly design, manufacture and test its engine and components: to ensure their airworthiness; to take reasonable precautions to ensure that the engine and components will not fail in normal conditions; to incorporate sufficient redundancy in the event of a component failure; to provide proper instructions and power envelopes; and to warn of limitations and any known or foreseeable failures, defects and/or anomalies.

73.    PWC breached its aforementioned duties to use reasonable care by failing: to design, manufacture and assemble it's engine in an airworthy manner and as designed, intended and as FAA Certificated; to ensure that rated power advertised, and represented in the pilot operating handbook and FAA Type and/or Supplemental Type Certificate(s) was available to the pilot; to incorporate safe, reliable components and predict and prevent failures through proper testing and redundancy;   and to provide pilots with reasonably sufficient warnings, instructions, directions, limitations and envelopes through timely notices, service bulletins and/or Airworthiness Directives, of any known limitations, defects or potential failures in their engine; and,   otherwise design, manufacture, test, market, sell and support its engine.

74.    As a direct and proximate result of the negligence of PWC, as aforesaid, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Pratt & Whitney Canada, and demands a jury on all issues triable.

## COUNT VI

## Strict Liability of Pratt & Whitney Canada

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) and paragraph seventy-one (71) above, and alleges further:

75.    PWC entered its PT6A-67B engine into the stream of commerce as a new product for incorporation into N950KA.

76.    At the time it left the control and custody of PWC, it was in a defective and unreasonably dangerous condition by nature of the defects described in paragraph forty-four (44)(i) above and was in substantially the same condition at the time of the crash as at the time of first delivery by PWC.

77.    PWC knew its engine would be used without any ability to inspect for the hidden defects above, which were not visible or known to Ronald Bramlage prior to the crash despite a diligent pre-flight inspection, but known to PWC, which failed to warn Mr. Bramlage.

78.    As a direct and proximate result of the defective nature of N950KA's engine and its insufficient warnings, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Pratt & Whitney Canada, and demands a trial by Jury on all issues.

## COUNT VII

### Negligence of Goodrich

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) above, and alleges further:

79.    Goodrich designed, manufactured, assembled, marketed and sold angle-of-attack transmitters for incorporation into N950KA.

80.     As the manufacturer, Goodrich owed a reasonable duty of care to the pilots using N950KA and their foreseeable passengers to properly design, manufacture and test its angle-of-attack transmitters: to ensure their airworthiness; to take reasonable precautions to ensure that the transmitters would not fail in normal conditions; to incorporate sufficient redundancy in the event of a failure; to provide proper instructions, and to warn of limitations and any known or foreseeable failures, defects and/or anomalies.

81.     Goodrich breached its aforementioned duties to use reasonable care by failing to design, manufacture and assemble airworthy angle-of-attack transmitters as designed, intended and certified by the FAA, and to reasonably warn, through timely notices, service bulletins and/or Airworthiness Directives, of any known limitations, defects or potential failures with the devices.

82.     As a direct and proximate result of the negligence of Goodrich, as aforesaid, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Rosemount Aerospace, Inc, and demands a jury on all issues triable.

# COUNT VIII

## Strict Liability of Goodrich

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) and paragraph seventy-nine (79) above, and alleges further:

83.    Goodrich entered its angle-of-attach transmitters into the stream of commerce as a new product for incorporation into N950KA.

84.    At the time they left the control and custody of Goodrich, they were in a defective and unreasonably dangerous condition by nature of the defects described in paragraph forty-four (44)(g) and (h) above and were in substantially the same condition at the time of the crash as at the time of first delivery by Goodrich.

85.    Goodrich knew its angle-of-attack transmitters would be used without any ability to inspect for the hidden defects above, which were not visible or known to Ronald Bramlage prior to the crash despite a diligent pre-flight inspection but known to Goodrich, which failed to warn Mr. Bramlage.

86.    As a direct and proximate result of the defective nature of N950KA's angle-of-attack transmitters, and their insufficient warnings, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Rosemount Aerospace, Inc., and demands a trial by Jury on all issues

# COUNT IX

## Negligence of Martin & EPPS

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) above, and alleges further:

87.     Martin and EPPS performed the maintenance, inspections and testing of N950KA in 2011 and 2012, as described in paragraphs twenty-eight (28) through thirty (30) above.

88.     As FAA Certificated Repair Stations, Service Centers, Mechanics, Inspectors and holders of FAA Airframe certificates, Powerplant certificates and Inspection Authorization certificates, Martin and EPPS owed a reasonable duty of care to the pilots using N950KA and their foreseeable passengers to properly maintain, repair, inspect and test the aircraft, engine avionics and components, to properly comply with Manufacturers Maintenance and Inspection guides, Service Notices, Service Bulletins and Airworthiness Directives,  and to ensure the aircraft and its components were airworthy, complied with their relative Type Certificates and/or Supplemental Type Certificates in a professional and workmanlike manner.

89.     Martin and EPPS breached their aforementioned duties to use reasonable care by failing to   properly maintain, repair, inspect and test N950KA, its engine, avionics and components, in accordance with the manufacturers Maintenance and Inspection guides, Service Notices, Service Bulletins and Airworthiness Directives,  and to ensure the aircraft and its components were airworthy, complied with their relative

Type Certificates and/or Supplemental Type Certificates in a professional and workmanlike manner.

90.   As a direct and proximate result of the negligence of Martin and EPPS, as aforesaid, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Martin Aviation, Inc., and Epps Air Service, Inc., and demands a trial by Jury on all issues.

## COUNT X

### Strict Liability of Martin & EPPS

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) above, and alleges further:

91.   During their maintenance and inspections, Martin & EPPS sold various new parts and products for incorporation into N950KA.

92.   To the extent that Martin and/or EPPS sold new components, they entered the same into the stream of commerce.

93.   When they left the control and custody of Martin and EPPS, they were in a defective and unreasonably dangerous condition by nature of the defects described in paragraph forty-four (44) above and were in substantially the same condition at the time of the crash as at the time of first delivery by Martin and EPPS.

94.    Martin and EPPS knew that the parts would be used without any ability to inspect for the hidden defects above, which were not visible or known to Ronald Bramlage prior to the crash despite a diligent pre-flight inspection but known to Martin and EPPS who failed to warn Mr. Bramlage.

95.    As a direct and proximate result of the defective nature of the parts sold and installed by Martin and EPPS and their insufficient warnings, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Martin Aviation, Inc., and Epps Air Service, Inc., and demands a trial by Jury on all issues.

## COUNT XI

### Negligence of Glenair, Leach & DRI

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) above, and alleges further:

96.    Leach and DRI designed, manufactured, assembled, and sold the FMS system's incorporated Relays that controlled various trim systems, disconnects and their interrupts. Glenair designed, manufactured, assembled, and sold the FMS system's incorporated connectors and plugs.

97.    As the manufacturers, Glenair, Leach and DRI owed a duty of reasonable care to properly design, manufacture and test their products; to be airworthy; to ensure

that they would not fail in foreseeable flight conditions; to have sufficient redundancy as to allow them to function in the event of a foreseeable failure or anomaly; to provide proper instructions on their use; and to warn of limitations and any foreseeable failures and/or defects.   Glenair, Leach and DRI breached their aforementioned duties to use reasonable care in their design, assembly and/or manufacture of their relays by failing: to manufacture them in an airworthy manner, as  designed; intended and as FAA Certificated;   to incorporate safe and proven components so as to prevent a run-a-way trim situation that cannot be overcome or interrupted by the pilot; to predict and prevent failures through proper testing and redundancy; and to reasonably warn, through timely instructions, notices, service bulletins and/or Airworthiness Directives, of any known limitations, defects or potential failures in their products.

98.    As a direct and proximate result of the negligence of Glenair, Leach and DRI, as aforesaid, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Glenair, Leach and DRI, and demands a trial by jury on all issues triable.

## COUNT XII

### Strict Liability of Glenair, Lynch and DRI

Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs one (1) through forty-eight (48) and ninety-six (96) above, and alleges further:

99.    Glenair, Leach and DRI entered their products, as new products into the stream of commerce for incorporation into N950KA.

100.    When their products left their control and custody, they were in a defective and unreasonably dangerous condition by nature of the defects stated in forty-four (44)(b)-(e) above and they were in substantially the same condition at the time of the crash as at the time of first delivery.

101.    Glenair, Leach and DRI knew their relays would be used without the ability to inspect for the hidden defects above, which were not visible or known to Ronald Bramlage prior to the crash despite a diligent pre-flight inspection, but known to Glenair, Leach and DRI, which failed to warn Mr. Bramlage.

102.    As a direct and proximate result of the defective nature of the plugs, connectors and relays, and their insufficient warnings, the Bramlage family, their Survivors and Estates have incurred the damages alleged in paragraph forty-eight (48) above.

WHEREFORE, Plaintiff demands judgment for damages and costs of this action against Glenair, Leach and DRI, and demands a trial by Jury on all issues.

## JURY DEMAND

Plaintiff demands a trial by jury on all triable issues alleged in this Complaint.

SPOHRER & DODD, P.L.

Barry E. Newman, Esq.
Florida Bar No.0246300
Robert F. Spohrer, Esq.
Florida Bar No. 184500
701 West Adams Street, Suite 2
Jacksonville, FL 32204
(904)309-6500 Telephone
(904)309-6501 Facsimile
bnewman@sdlitigation.com
eservice@sdlitigation.com
Trial Counsel for Plaintiff